## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DEALER COMPUTER SERVICES, INC.,** | Civ. No. 2:13-5440 (WJM) |
| **Plaintiff,** | |
| v. | **OPINION** |
| **DAVID LOMAN, et al.** | |
| **Defendants.** | |

### WILLIAM J. MARTINI, U.S.D.J.:

This is a debt recovery action.  Plaintiff Dealer Computer Services, Inc. ("DCS") alleges that Defendants – Loman Properties and its individual officers (members of the Loman family) – engaged in fraudulent transfers.  Specifically, DCS alleges that Defendants improperly transferred monies to themselves to prevent DCS from recovering its $2.3 million judgment against Loman Ford and three affiliated car dealerships (companies the Defendants owned which are now insolvent).

DCS moves for summary judgment on two issues: (1) Defendants' affirmative defense that they did not have notice of DCS's claims against the three affiliated dealerships; and (2) DCS's claim that the affiliated dealerships fraudulently transferred rent payments to Loman Properties.  There was no oral argument.[1]  Fed. R. Civ. P. 78(b). DCS's motion for summary judgment as to notice is **GRANTED**.  Loman Ford and the affiliated dealerships were commonly owned, therefore, the affiliated dealerships should have known of the claims against them before they began winding down the businesses. DCS's motion for summary judgment as to the rent claims is **DENIED** because Defendants have raised a genuine issue of fact as to whether the transfers actually occurred.

### I.      BACKGROUND

---

[1] The parties' request that the Court hold oral argument on this motion is denied.  *See Cope v. Soc. Sec. Admin.*, 532 Fed. App'x 58, 60 (3d Cir. 2013) ("The District Court has discretion as to whether to hold a hearing.").

The following facts are undisputed unless otherwise noted.

### A. The Parties

Plaintiff DCS is a company that provides customized computer hardware, software, and related support services to car dealerships nationwide. *See* Def. Statement of Facts (ECF 59) ¶ 1. Defendants are David and Carol Loman (husband and wife); their children, John and Helen; and Loman Properties, L.P., a New Jersey limited partnership.

Loman Properties has the following corporate structure: Carol Loman is Loman Properties' general partner; the Loman Family Trust is its limited partner. *Id*. ¶ 6. John and Helen Loman are Loman Properties' two beneficiaries. *Id*.

The four individually-named Defendants were also officers and shareholders of Loman Ford Incorporated ("Loman Ford"). *Id*. ¶¶ 2-3. Loman Ford is a now-defunct car dealership that owned and operated three affiliated dealership businesses: (1) Loman Ford of Parsippany, Inc. ("LFP"); (2) Loman Auto Group, Inc. ("LAG"); and (3) Brunswick Motors, Inc. ("Brunswick") (collectively, the "affiliated dealerships"). *Id*. ¶¶ 3-4. The affiliated dealerships are now also out of business. *Id*. ¶¶ 15-20.

### B. The Factual Background

In May 1993, Loman Ford entered into a contract with DCS, wherein DCS agreed to provide Loman Ford with customized computer hardware and services in exchange for monthly payments. *Id*. ¶ 1. During the term of the Contract, Loman Ford expanded from a single franchise at a single location to eight franchises at four locations. DCS contends that, in a 2004 amendment to the Contract, John Loman agreed that "each individual dealership location that licenses Application Programs under this Agreement is jointly and severally liable for the entire contractual obligation." Dillon Exhibit A, ¶ 5; Exhibit B. Defendants dispute the authenticity of the 2004 Contract amendment and claim that only Loman Ford, and not the affiliated dealerships or Loman Properties, agreed to make monthly payments to DCS. Def. Memo., 8-9.

By 2008, Loman Ford had repeatedly failed to pay DCS for its services, in breach of the parties' contract. Def. Statement of Facts ¶¶ 8-10. In 2008, DCS initiated an arbitration against Loman Ford. Def. Memo., 18-19.

Between December 2009 to December 2012, Loman Ford and its affiliated dealerships winded down their businesses. Specifically, in December 2009, LFP was terminated. Def. Statement of Facts ¶ 15. In or about 2009, the Chrysler Jeep franchise of LAG was terminated. *Id*. ¶ 16. In May 2011, the Subaru franchise of LAG was sold to a third party and LAG ceased its normal business operations. *Id*. ¶ 17. In December 2011, the Ford franchise of Loman Ford was terminated. *Id*. ¶ 19. In November 2012,

the Kia franchise of Loman Ford was sold to a third party. *Id.* ¶ 20. Sometime after December 2012, Loman Ford ceased normal business operations. *Id.*

Meanwhile, in May 2012, DCS was awarded approximately $2.3 million in its arbitration. *Id.* ¶ 12; Dillon Ex. A. The award was against Loman Ford and the affiliated dealerships. *Id.* In September 2012, the United States District Court for the Southern District of Texas confirmed the award. *Id.* ¶¶ 11-12. In November 2012, that judgment was registered in the District of New Jersey. *Id.* ¶ 13. DCS has thus far recovered $108,000 against the judgment through a levy on a Loman Ford bank account. *Id.* ¶ 14.

### C. The Instant Action

In January 2015, DCS filed its amended Complaint against Defendants to recover the monies owed to it by the now-insolvent Loman Ford and the affiliated dealerships. DCS raises claims of fraudulent transfer, unjust enrichment, and seeks a constructive trust and damages. The gravamen of DCS's Complaint is that Defendants wrongfully diverted to themselves monies in the form of rent payments, loan repayments, guaranteed payments, or management fees, which would have otherwise been available to pay DCS. Comp. ¶¶ 28, 31, 33, 38. DCS also alleges that, even though the businesses were insolvent, the individual defendants caused Loman Ford and the affiliated dealerships to make shareholder distributions, continue to pay rent to Loman Properties, and increase the individual Defendants' own compensation. *Id.* ¶ 35.

As is relevant to the present motion, DCS alleges that, in 2010, Defendants caused LFP to pay $600,000 in rent to Loman Properties, despite the fact that LFP was no longer in business. *Id.* at ¶ 31. DCS further alleges that, in 2011, although LAG was no longer conducting business and DCS had not been paid its amounts past due, Defendants caused LAG to pay $110,000 in rent to Loman Properties. *Id.* at ¶ 33.

In response to the Complaint, Defendants raise the affirmative defense that, because the three affiliated dealerships were not parties to the 1993 Contract between DCS and Loman Ford, or the 2008 arbitration action by DCS against Loman Ford, they did not have notice of DCS's contractual claim against them until the final arbitration award was issued in May 2012. *See, e.g.,* Second Amended Answer, ¶¶ 14, 22 and Affirmative Defenses (d) and (g).

DCS now moves for summary judgment as to: (1) Defendants' notice defenses, arguing that the affiliated dealerships had notice of DCS's potential claims against them based upon either the 2004 Contract amendment or the 2008 arbitration action; and (2) its claims of fraudulent transfers in the form of rent payments to Loman Properties by LFP in 2010 and LAG in 2011, respectively.

### II.    Legal Standard

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* The opposing party must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, when opposing a motion for summary judgment, the nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and "cannot simply reassert factually unsupported allegations contained in [the] pleadings." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citation omitted) (emphasis original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." (citations omitted)).

## III.   DISCUSSION

As a threshold matter, the filings by both parties in this case are confusing and, at times, incomprehensible. The Court advises the parties to use precise legal terminology and coherent narratives in their future filings so as to allow the Court to more easily construe claims and arguments.

### A.  Notice

The Court finds that DCS has met its burden of demonstrating the absence of a genuine issue of material fact as to notice. Summary judgment is, therefore, **GRANTED** as to this issue.

First, DCS has established – and Defendants do not dispute – that Defendants commonly owned and managed Loman Ford and the affiliated dealerships. *See* Def. Br. at 12-13 ("it is Defendants' position that the collective dealerships [including Loman Ford] acted as a common unit from inception . . . ."). Defendants also stipulate to the fact that, by October 2008, Loman Ford had stopped paying the monthly invoices from DCS,

and DCS had initiated an arbitration action against Loman Ford. Defendants essentially argue that because only Loman Ford was named in the 2008 arbitration, the affiliated dealerships had no reason to know of DCS's claims against them. But this is a distinction without a difference. Defendants simultaneously claim that the tax returns and finances of each dealership cannot be viewed in isolation because "the collective dealerships had previously all acted as a common unit, whereby there existed numerous inter-company transfers when needed." *See* Def. Br. at 23. Because Defendants argue that the collective dealerships acted as one unit, the Court finds as a matter of law that Defendants, as officers and shareholders of Loman Ford, had notice of DCS's claim against the affiliated dealerships before December 2009, when the dealerships first began to wind down their businesses. *Cf. In re WL Homes*, 534 Fed. App'x 165, 169-70 (3d Cir. 2013) (applying principles of agency to determine whether subsidiary had notice of claim when parent company was notified); *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 106 (3d Cir. 2009) (explaining that, "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal"). Defendants' arguments in opposition do not persuade this Court otherwise.

As best as can be discerned, Defendants present three broad claims in opposition to DCS's motion: (1) John Loman apparently did not read the 2012 arbitration award he signed on behalf of Loman Ford and the affiliated dealerships, but merely executed it at the direction of his attorney; (2) DCS relies upon evidence that is "not in evidence, is hearsay, is not authenticated, and is not within the personal knowledge of [DCS's counsel]"; and (3) a "genuine issue of material fact" exists because depending on whether the individual Defendants had notice, different provisions of New Jersey's Uniform Fraudulent Transfer Act ("UFTA") may apply.

<u>First</u>, the only piece of affirmative evidence Defendants present to support their lack of notice claim is a certification by John Loman stating that he did not read the contents of the arbitration award he signed, but simply executed it at the direction of his attorney. But "it is well settled that affixing a signature to a contract creates a conclusive presumption that the signer read, understood, and assented to its terms." *Greenfield v. Twin Vision Graphics, Inc.*, 268 F. Supp. 2d 358, 373 (D.N.J. 2003); *see also Park Inn Int'l, LLC v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 374–75 (D.N.J. 2000) ("A failure to read a contract will not excuse a party who signs it, nor will the party's ignorance of its obligation."). Accordingly, Loman's failure to read the arbitration award cannot demonstrate that he did not have notice of its contents.

<u>Second</u>, rather than presenting any other affirmative evidence in support of their position, *see Williams*, 891 F.2d at 460, Defendants merely challenge the admissibility and believability of DCS's evidence, *see* Def. Memo at 18. Defendants' conclusory allegations that DCS's documentary evidence is "inadmissible hearsay" and unauthenticated will not be considered. *See In re Japanese Electronic Products Antitrust*

*Litigation,* 723 F.2d 238, 285 (3d Cir. 1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (authentication under the Federal Rules of Evidence requires only a "foundation from which a fact-finder could legitimately infer that the evidence is what its proponent claims it to be"); *see also Knopick v. Downey*, No. 1:09-CV-1287, 2013 WL 1882983, at *17 (M.D. Pa. May 6, 2013) ("Because Defendant does not point to exactly which paragraphs from the [exhibit] contain hearsay, the court will not parse through the report in an attempt to create a particularized hearsay objection."). A "nonmoving party . . . cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) (internal citations omitted). In any event, the Court does not rely upon any disputed evidence in concluding that, by 2008, Defendants had notice of DCS's claims against the affiliated dealerships.

Third, Defendants state that "the notice requirement is a genuine issue of material fact" because, depending on whether the individual Defendants had notice, different provisions of New Jersey's UFTA may apply. Defendants appear to be confused as to the summary judgment standard generally. To demonstrate that a "genuine issue of material fact" exists, it is not enough to simply show that a different rule may apply if one party's narrative is accepted over the other's narrative. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.

### B. Rent

DCS claims that it is entitled to summary judgment with respect to its claim of fraudulent transfer as to the monthly rents paid by LFP and LAG for the LFP premises. The Court disagrees.

DCS alleges that LFP and LAG continued to pay monthly rent in 2010 and 2011, respectively, to Loman Properties, even though both companies were insolvent and in the process of winding down business. Essentially, DCS asserts that Defendants, through the affiliated dealerships, fraudulently transferred money (in the form of rent payments) to themselves, even though DCS had an outstanding judgment against the dealerships.

In support of its claim, DCS provides copies of LFP's 2010 tax return indicating that LFP paid $247,000 in rent that year, and LAG's 2010 and 2011 tax returns stating that LAG paid $300,000 and $178,439 in rent, respectively, each year. Dillon Cert. (ECF 47-2), Exs. I, J. DCS also includes an August 2014 letter from Defendants' counsel stating that, during the relevant time period, LFG paid $20,600 a month and LAG paid $8,750 a month in rent to Loman Properties, the property owner. *Id.* Ex. P. In that letter, Defendants' counsel indicates that the Lomans were out of town, but Erik Lampinen (a former Loman Ford employee) would set a date to "go over any loose ends regarding business records" with DCS's expert. Kridel Cert. (ECF 57), Ex. A.

Defendants contend that no such rent payments were made. Instead, they claim that the "tax returns do not reflect actual cash flows," and that neither LFP nor LAG actually "made any transfers or payments of rent to Loman Properties whatsoever" during the relevant time period. Def. Br. at 14, 19. Defendants offer the following evidence to support this claim. First, Christopher Vulpis, the accountant who prepared the tax returns at issue, avers that the rents were never paid to Loman Properties by Defendants. ECF doc. 54. According to Vulpis, the LFP rents were never paid by LFP but rather, "advanced by a source other than LFP." And LAG did not pay any rent to Loman Properties in 2011, but rather, paid rent to "FAWBS," an unrelated third party. Second, Lampinen avers that the tax returns do not reflect payments of rent but rather "rent accruals" that were reclassified as "rent payments" by the accountant. ECF doc. 55. Third, Kenneth DeGraw, a CPA, reviewed the discovery and provided an affirmation stating that, based on the dealerships' finances, he believed the lines on tax returns did not represent payments of rent. ECF doc. 56. Fourth, Defendants' counsel avers that he was mistaken in his August 2014 letter when he stated that LFP and LAG paid rent to Loman Properties because he had relied upon the inaccurate representations made by Lampinen. ECF doc. 57. Finally, John Loman avers that LFP and LAG paid rent to FAWBS, not Loman Properties. ECF doc. 58. On that basis of these affidavits, the Court cannot say that the rent transfers occurred as a matter of law.

Because the Court finds that an issue of material facts exists as to whether the transfers occurred, the Court does not reach the issue of whether any alleged transfers were fraudulent. Summary judgment is, therefore, **DENIED** as to the rent claims.

## IV.    CONCLUSION

For the above reasons, DCS's motion is **GRANTED in part and DENIED in part**. An appropriate order follows.


_____
                s/ William J. Martini
           **WILLIAM J. MARTINI, U.S.D.J.**

**Date: December 21, 2015**